IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 11, 2004

## STATE OF TENNESSEE v. CHRISTOPHER L. WILLIAMS, COREY A. ADAMS, AND ORTEGA WILTZ

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-C-1673    Cheryl Blackburn, Judge**

---

**No. M2003-00517-CCA-R3-CD - Filed March 16, 2005**

---

The appellants, Christopher L. Williams, Corey A. Adams, and Ortega Wiltz, appeal as of right from their convictions in the Davidson County Criminal Court. Following a jury trial, Appellant Williams was convicted of three counts of especially aggravated kidnapping, Appellant Adams was convicted of three counts of facilitation of especially aggravated kidnapping, and Appellant Wiltz was convicted of two counts of facilitation of especially aggravated kidnapping. Thereafter, the trial court sentenced Appellant Williams to a total effective sentence of seventy-five years incarceration. Appellant Adams was sentenced to a total effective sentence of thirty-six years incarceration, and Appellant Wiltz was sentenced to a total effective sentence of forty years incarceration. On appeal, the appellants challenge the sufficiency of the evidence to sustain their convictions and the sentences imposed by the trial court. Appellant Adams also challenges the trial court's ruling that certain prior convictions were admissible for the purpose of impeaching a defense witness. Based upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

C. LeAnn Smith, Nashville, Tennessee, for the appellant, Christopher L. Williams.

David M Hopkins, Nashville, Tennessee, for the appellant, Corey A. Adams.

Ronald E. Munkeboe, Jr., Nashville, Tennessee, for the appellant, Ortega Wiltz.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret T. Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I.  Factual Background

On May 29, 2001, Appellant Christopher L. Williams telephoned Willie Robertson and asked to see a recording studio Robertson intended to rent.  The studio was located in the basement of a house owned by Rick Harbin, which house was located on 108 Keaton Avenue in Nashville.  Harbin lived above the studio.  Robertson agreed to meet Appellant Williams and telephoned Harbin to ask him to unlock the studio.  At approximately 8:00 p.m., Robertson and his four-year-old son, Willie Moss, drove to meet Appellant Williams at a convenience store.  When Appellant Williams arrived, he was accompanied by Appellants Corey A. Adams and Ortega Wiltz.  The appellants followed Robertson to the studio.  At trial, Robertson testified that he had known Appellants Williams and Adams for approximately ten years and that as juveniles they had been in Woodland Hills Youth Development Center at the same time.  However, Robertson testified that he had never before seen Appellant Wiltz.

When they arrived at the studio, Robertson left his son sleeping in the backseat of his car which was parked outside the door to the studio.  Harbin met the men downstairs and unlocked the door.  He and Robertson then showed the appellants around the studio.  However, within minutes, Appellant Williams pointed a gun in Robertson's face and said, "I know you got some money.  I need some money."  Robertson told Appellant Williams that he had invested all his money in the studio and had only three dollars.  Appellant Williams then ordered Robertson to get on the floor and placed his gun in Robertson's mouth.  When Robertson informed Appellant Williams that he might be able to "get them some [money]," Appellant Williams replied, "[M]y boys think you're playing."  Appellants Williams and Adams then blindfolded Robertson and hogtied him with a chain.  According to Robertson and Harbin, all three appellants were armed with guns.

Meanwhile, Appellant Wiltz struck Harbin in the head with a pistol, knocking him to the ground.  Appellants Williams and Wiltz then dragged Harbin into an adjoining room and ordered him to "lay down and be quiet."  Thereafter, Appellant Williams returned to the other room, while Appellant Wiltz bound Harbin, placed a rope around his neck, and struck him in the head and legs with an axe handle.  Once Robertson and Harbin were restrained, Appellant Wiltz picked up a handsaw and "slashed" their throats.  Although the saw cut the victims' throats and caused bleeding, the cuts were not "major."  Appellant Wiltz also attempted to smother Harbin with a plastic bag, "gagged" him, and took his cellular telephone, keys, and money.

While Appellant Wiltz "work[ed] with" Harbin, Appellants Williams and Adams forced Robertson to telephone people he knew to ask for money.  Although Robertson's restraints had been loosened to permit him to use the telephone, he remained blindfolded, and his hands were bound with a chain.  After making several calls, Robertson informed Appellant Williams that his cousin, Eric "Smurf" Brown, would give him some money, but he would have to drive to south Nashville.  Appellant Williams took Robertson out of the studio and placed him in the backseat of his vehicle.  Appellants Williams and Adams then got into the vehicle and drove toward south Nashville.  Appellant Wiltz followed in Robertson's vehicle with the child asleep in the backseat.

The appellants left Harbin lying bound and gagged on the studio floor. Harbin testified at trial that he felt his body "getting cold because [he] had . . . lost a lot of blood." Eventually, Harbin was able to remove the gag from his mouth and breathe easier. After approximately forty-five minutes, he managed to escape from his restraints and make his way to the house of a neighbor who was sitting on the porch. The neighbor looked at Harbin, but refused to help him, saying, "I don't want no problem." Harbin then "drug [himself] across the street" to another neighbor's house. As soon as the neighbor saw Harbin, she telephoned the police and paramedics. Harbin was taken to the hospital where he was treated and released.

During the drive to south Nashville, Appellant Wiltz telephoned Appellant Williams and told him to "hurry up and do something" because Robertson's vehicle was nearly out of gas. Appellant Williams drove to University Court where Brown lived. However, they did not go to Brown's apartment because Robertson was unable to walk to Brown's apartment and they did not believe that Brown would give them any money.

Thereafter, Appellant Wiltz parked Robertson's vehicle in an alley, threw the keys, and ran away, leaving the child in the backseat. Appellant Williams drove to the alley and put the child into the backseat of his car. He then put Robertson into the driver's seat of Robertson's vehicle and told him that he had thirty minutes to get some money or they would kill his son. After Appellant Williams drove away, Robertson "[w]iggled out" of the blindfold and climbed out of the car window to avoid disturbing any fingerprints that may have been on the door. He then ran to the "projects" and flagged down a patrol vehicle.

The officer drove Robertson back to his vehicle and alerted dispatch of the kidnapping. Robertson telephoned Brown to come to the scene. While Brown was at the scene, Appellant Williams, who had taken Robertson's cellular telephone, telephoned Brown's cellular telephone and asked to speak with Robertson. Appellant Williams asked Robertson if he had the money. Robertson replied that he had only $6,000. Appellant Williams told Robertson that six thousand dollars was not enough and to call back when he had more money. According to Robertson, Appellant Williams wanted $50,000.

Shortly thereafter, Robertson was taken to the Criminal Justice Center. At the Criminal Justice Center, Appellant Williams again telephoned Robertson and inquired about the money. Robertson informed Appellant Williams that he had only $8,300. Appellant Williams replied, "[W]ell, bring that. That's cool." Robertson and Appellant Williams agreed to meet in north Nashville. Robertson relayed the information to police, and officers were dispatched to the area. Robertson was subsequently informed that the kidnappers had been apprehended, and his son was brought to the Criminal Justice Center. While at the Criminal Justice Center, officers asked Robertson to view a photographic lineup that included a photograph of Appellant Adams. At that time, Robertson was unable to identify Appellant Adams; however, he positively identified Appellant Adams at the preliminary hearing. Harbin viewed the lineup while at the hospital and immediately identified Appellant Adams as one of the kidnappers.

At trial, Metro Police Officer Jeffrey Tharpe testified that on May 29, 2001, he was on patrol at University Court when Robertson approached his patrol car. According to Officer Tharpe, Robertson was "very upset . . . [and] shouting my kid has been kidnapped." Robertson informed Officer Tharpe that the kidnappers had demanded money and that he knew one of the kidnappers. Officer Tharpe transported Robertson to his vehicle and alerted other officers of the kidnapping, providing a description of the suspect's vehicle. Officer Tharpe observed a chain in the front seat of Robertson's vehicle.

Thereafter, Sergeant Duane C. Williamson arrived at the scene. When the cellular telephone Robertson had in his possession began to ring, Sergeant Williamson told Robertson that he wanted to listen to the person on the telephone. As Sergeant Williamson listened, he overheard a man tell Robertson, "I'm not playing. I'm going to shoot him in the stomach." Robertson informed Sergeant Williamson that the person on the telephone was Appellant Williams. Sergeant Williamson advised Robertson to tell Appellant Williams that he was getting the money together and would meet him in a certain area in north Nashville. Sergeant Williamson then "flooded" the area with marked and unmarked police cars looking for the suspect's vehicle.

After being advised of the alleged kidnapping, Sergeant Danny Collins drove past a vehicle matching the description of the suspect's vehicle. In an attempt to obtain the license plate number, Sergeant Collins followed the vehicle. When the suspect's vehicle suddenly stopped, Sergeant Collins parked approximately three car lengths behind the vehicle. He observed Appellant Williams step out of the vehicle with what appeared to be a semi-automatic pistol in his right hand. Sergeant Collins alerted the other officers in the area that Appellant Williams was armed and the other officers "moved in."

Upon seeing the police cars, Appellant Williams jumped into his vehicle and attempted to flee. As Officer Gregory Blair drove by Appellant Williams' vehicle, he directed a spotlight into the vehicle and observed "two male blacks and a little boy sitting on the passenger's lap." Appellant Williams drove around two patrol cars and attempted a sharp right turn, before crashing into a low brick wall. Appellant Williams then jumped from the vehicle and ran. He was apprehended attempting to climb a nearby fence.

After the wreck, Appellant Adams stepped from the vehicle holding the child with his left hand and a black gun in his right hand. Immediately, Appellant Adams released the child and ran into the alley. The child, who was left standing in the street "totally confused and disoriented," was returned to his father at the Criminal Justice Center. Appellant Adams was subsequently apprehended by the K-9 Squad. Upon being taken into custody, Appellant Adams told the arresting officer, "[M]an, I know I'm in some shit, but I was just caught in the crossfire. I knew about the kidnapping, but I didn't do it."

At the scene of the wreck, officers discovered a nine-millimeter pistol between the seats and a .45 caliber semi-automatic pistol and a loaded magazine on the ground outside the passenger-side door. At the recording studio, officers collected a rope, chain, and an antenna that appeared to have

been twisted together and used to tie up one of the victims. Officers also processed Appellant Williams' and Robertson's vehicles for latent prints, but were unable to match any of the fingerprints to the appellants. However, DNA of a blood sample collected from the backseat of Appellant Williams' vehicle matched that of a sample taken from Robertson.

On the evening of May 30, 2001, Sergeant Williamson received an anonymous tip from Crime Stoppers "that [the] third person involved was fixing to get on a bus to Chicago, and gave [Sergeant Williamson] the height, weight, and clothing description." Sergeant Williamson and other officers proceeded to the bus station and observed Appellant Wiltz at the ticket counter. According to Sergeant Williamson, Appellant Wiltz matched the description and "looked . . . like he was trying to disappear." Sergeant Williamson approached Appellant Wiltz and identified himself. Appellant Wiltz agreed to talk with officers and went voluntarily to the Criminal Justice Center. At the Criminal Justice Center, Appellant Wiltz agreed to be photographed and have his photograph placed in a lineup. Robertson and Harbin were then asked to view the photographic lineup. Viewing the lineup separately, both Robertson and Harbin positively identified Appellant Wiltz.

At trial, Appellant Williams testified that approximately one month prior to the instant offenses he gave Robertson 252 grams of cocaine to sell. He instructed Robertson to pay him $8,300 after selling the cocaine. According to Appellant Williams, selling that amount of cocaine usually takes seven to ten days. When Appellant Williams had not received the money within that time period, he contacted Robertson. Robertson informed Appellant Williams that he had been arrested with 140 grams of the cocaine and had to hire a lawyer and make bond.

Appellant Williams testified that on the night of the alleged events, he contacted Robertson and asked for the money. Robertson responded that he did not have it. Later that evening, Appellant Williams met Robertson, and they went to the recording studio alone. Once inside the studio, Appellant Williams again asked for the money, but Robertson responded, "I told you I would get your money when I get it." Appellant Williams then struck Robertson, and a fight ensued. Eventually, Appellant Williams pointed his gun at Robertson and told him to give him the studio equipment. Williams testified that when Robertson stated that he did not have the equipment, he considered shooting Robertson. However, because they were friends, he decided against it.

Thereafter, Robertson told Appellant Williams that he could get the money, but Appellant Williams did not believe him and attempted to leave. Robertson said, "[I]f you think I'm playing, here, hold [my son] and I'm going to go get the money." Robertson placed his son in the backseat of Appellant Williams' vehicle, saying that he did not want to take his son to University Court where he was going to get the money from his cousin. He then told Appellant Williams to meet him in north Nashville.

Appellant Williams testified that while waiting for Robertson to get the money, he picked up Appellant Adams and drove to "Dodge City . . . to get [the four ounces of cocaine] he had for [Appellant Adams]." Appellant Williams testified that the child slept as they drove around town. Eventually, Appellant Williams attempted to telephone Robertson, but Robertson did not answer the

telephone. Thereafter, Appellant Williams observed a vehicle following them. When he pulled to the side of the road, the vehicle stopped behind him.

Appellant Williams testified that he stepped out of the vehicle with his gun and told Appellant Adams to hold the child down on the backseat in case there was a "shoot out." When no one got out of the other vehicle, he got back into the vehicle. Suddenly, police vehicles "were everywhere." Appellant Williams drove around the police vehicles, but crashed into a stone wall. Because he had drugs and guns in the car, he attempted to flee, dropping his pistol in the vehicle. Appellant Williams related that prior to the preliminary hearing he had never seen Appellant Wiltz.

Appellant Adams testified that prior to his arrest he had never met Robertson, Harbin, or Appellant Wiltz. He related that at 11:30 p.m. on May 29, 2001, Appellant Williams picked him up, and they went to Dodge City to get some cocaine. According to Appellant Adams, the son of one of Appellant Williams' friends was sleeping in the backseat of the vehicle. After getting the cocaine, Appellant Adams asked Appellant Williams to take him home, but Appellant Williams told him that he was waiting for a call from Robertson. As they drove around, a white vehicle began to follow them. Appellant Williams stopped, got out of the car with a gun, and told Appellant Adams to keep the child down on the seat. Within seconds, police vehicles arrived, and Appellant Williams jumped into the vehicle. After Appellant Williams wrecked the vehicle, Appellant Adams checked to see if the child was okay and then ran, dropping his pistol on the ground. He was subsequently apprehended by the K-9 Squad.

Martha Jordan, the records clerk at Woodland Hills Youth Development Center, testified on behalf of Appellant Adams. She related that there were no records that Appellant Adams had ever been confined at the facility.

Appellant Wiltz testified that prior to the instant charges, he had never seen Robertson, Robertson's son, or Harbin and had never been to the recording studio at 108 Keaton Avenue. He further claimed that prior to the preliminary hearing, he had never seen Appellants Williams or Adams. Appellant Wiltz testified that in the days prior to the alleged offenses, he had traveled by bus from Los Angeles to Las Vegas and Dallas, before arriving in Nashville. When he arrived in Nashville, he rented a hotel room where he "hung out" until deciding to travel to Chicago. On the evening of May 30, 2001, he was at the Greyhound Bus Station when police officers asked to speak with him. The officers then asked him to go to the police station, advising him that he fit the description of an alleged kidnapper. Appellant Wiltz testified that he cooperated with police because he "didn't do anything." He denied any involvement in the instant kidnappings. On cross-examination, Appellant Wiltz conceded that he had prior felony convictions of theft and robbery and that he was a drug addict.

Based upon the foregoing evidence, the jury convicted Appellant Williams of four counts of especially aggravated kidnapping (Counts 1, 3, 6 and 7) and two counts of aggravated kidnapping (Counts 2 and 5). The jury acquitted Appellant Williams on Count 4. Thereafter, the trial court merged Count 2 with Count 1, and Counts 5 and 6 with Count 7. The jury convicted Appellant

Adams of four counts of facilitation of especially aggravated kidnapping (Counts 1, 3, 6 and 7) and two counts of facilitation of aggravated kidnapping (Counts 2 and 5) and acquitted Appellant Adams on Count 4. The trial court merged Count 2 with Count 1, and Counts 5 and 7 with Count 6. The jury convicted Appellant Wiltz of two counts of facilitation of especially aggravated kidnapping (Counts 1 and 3) and one count of facilitation of aggravated kidnapping (Count 2) and aquitted Appellant Wiltz on Counts 4, 5, 6 and 7. The trial court merged Count 2 with Count 1.

Following a hearing, the trial court sentenced Appellant Williams to a total effective sentence of seventy-five years incarceration. Appellant Adams was sentenced to a total effective sentence of thirty-six years incarceration, and Appellant Wiltz was sentenced to a total effective sentence of forty years incarceration. The appellants now bring this appeal, challenging the sufficiency of the evidence and the sentences imposed by the trial court. Appellant Adams also challenges the trial court's ruling that certain prior convictions were admissible for the purpose of impeaching defense witness Mack Stone.

## II. Analysis

### A. Prior Convictions of Potential Defense Witness

We will first address Appellant Adams' issue challenging the trial court's ruling that certain prior convictions were admissible for the purpose of impeaching defense witness Mack Stone. In a jury-out hearing during the presentation of Appellant Adams' defense, the State notified the trial court of its intent to use Stone's 1989 conviction of criminal impersonation, 1992 convictions of sale of cocaine, and 1996 conviction of statutory rape for impeachment purposes. The State noted that because it did not learn that Stone would testify until the day before trial, it had been unable to provide advance notice. Appellant Adams objected to the use of the 1989 and 1992 convictions, arguing that the offenses were more than ten years old. The State responded that the ten-year limit was measured from the date of release from confinement and that the 1992 convictions were not outside the ten-year period.[1] The trial court found only the 1989 conviction to be inadmissible, stating,

> I'm going to let you impeach on the statutory rape and the two drug convictions. I'm going to find that – given that – I'm not sure exactly what Mr. Stone is going to be testifying to except he saw somebody get into a car, I guess. That can be very crucial, so his credibility is very important in this case, so I'm going to allow [the State] to impeach with those convictions.

Appellant Adams elected not to call Stone as a witness on his behalf.

---

[1] The instant trial commenced July 30, 2002.

On appeal, Appellant Adams does not challenge the admissibility of Stone's 1996 conviction of statutory rape. Instead, he contends that the trial court abused its discretion by ruling that the 1992 convictions of sale of a controlled substance were admissible to impeach Stone's credibility. Specifically, Appellant Adams argues that the convictions were outside the ten-year time limit provided by Rule 609(b) of the Tennessee Rules of Evidence. Appellant Adams also argues that the trial court failed to specify the facts and circumstances justifying the use of the convictions for impeachment purposes. The State maintains that Appellant Adams waived consideration of this issue by failing to include the issue in his motion for new trial and by failing to specify on appeal the witness and convictions being challenged. See Tenn. R. App. P 3(e); Tenn. Ct. Crim. App. R. 10(b). However, the State contends that, notwithstanding waiver, the trial court did not abuse its discretion in ruling that the convictions were admissible for impeachment purposes.

Initially, we note that, contrary to the State's contention, Appellant Adams raised the instant issue in his motion for new trial. Moreover, although Appellant Adams failed to specify on appeal the witness and convictions being challenged, this information was provided in his motion for new trial and can be gleaned from the record. Accordingly, we will address the issue on the merits.

Rule 609 of the Tennessee Rules of Evidence provides that if certain procedures are satisfied, the credibility of an accused may be attacked by evidence of prior convictions if the prior convictions were punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or involved dishonesty or false statement. Tenn. R. Evid. 609(a)(2). The Advisory Commission's Comments to Rule 609 state the correct balancing test to be used if the witness being impeached is not the accused in a criminal prosecution. Tenn. R. Evid. 609, Advisory Commission Comments; see also Neil P. Cohen, et al, Tennessee Law of Evidence, § 6.09[5][c] (4th ed. 2000). In that instance, "Rule 403 applies, and a conviction would be admissible to impeach unless 'its probative value is substantially outweighed by the danger of unfair prejudice' or other criteria listed in that rule." Tenn. R. Evid. 609, Advisory Commission Comments (quoting Tenn. R. Evid. 403).

However, Rule 609(b) provides:

> Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution; if the witness was not confined, the ten-year period is measured from the date of conviction rather than release. Evidence of a conviction not qualifying under the preceding sentence is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect.

A trial court's ruling under Rule 609 will not be reversed on appeal absent an abuse of discretion. State v. Mixon, 983 S.W.2d 661, 675 (Tenn. 1999).

Based upon the arguments of counsel at the hearing, it appears that in May of 1992 Stone was convicted of two counts of sale of cocaine. However, the record of Stone's criminal history was not included in the record on appeal. Thus, we are unable to determine the sentences imposed for the convictions or the date of Stone's release. In any event, our supreme court has previously held that drug convictions are not offenses involving dishonesty or false statement as contemplated by Rule 609 and, thus, are only slightly probative of credibility. State v. Waller, 118 S.W.3d 368, 371-72 (Tenn. 2003) (holding that "[t]he statutory elements of these offenses do not require that the controlled substance be sold or possessed in a manner that involves deceit or fraud"). Moreover, we conclude that the trial court failed to specify the facts and circumstances supporting the admission of the convictions. Regardless, as the State notes, Appellant Adams failed to make an offer of proof at trial or argue on appeal regarding Stone's proposed testimony. In light of these omissions and the overwhelming evidence at trial, we conclude that he has failed to demonstrate that he was prejudiced by the trial court's ruling. Accordingly, we conclude that the trial court's ruling regarding Stone's 1992 convictions of sale of cocaine, if error, was harmless. Id. at 374.

### B. Sufficiency of the Evidence

Next, we will address the appellants' contentions that the evidence adduced at trial was insufficient to sustain their convictions. When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Should the reviewing court find particular conflicts in the trial testimony, the court must resolve the conflicts in favor of the jury verdict. Tuggle, 639 S.W.2d at 914. This court will not reweigh or reevaluate the evidence. Bland, 958 S.W.2d at 659.

In the instant case, the appellants' sufficiency claims are based upon the alleged inconsistencies in Robertson's and Harbin's testimony and the evidence at trial. Specifically, the appellants contend that police found no evidence at the recording studio to corroborate Harbin's testimony. The appellants further contend that Robertson's account of events "defies logic and

common sense," claiming that the evidence revealed that Robertson was indebted to Appellant Williams for drugs. However, as noted, conflicts in the trial testimony must be resolved in favor of the jury verdict. Tuggle, 639 S.W.2d at 914. This court will not reweigh or reevaluate the evidence. Bland, 958 S.W.2d at 659.

Appellant Adams also challenges Robertson's identification of him as one of the kidnappers. Specifically, Appellant Adams contends that Robertson was unable to identify him in the photographic lineup immediately after the kidnappings and did not identify him as one of the kidnappers until the police mentioned his name. Appellant Adams also challenges Robertson's testimony that he had known Appellant Adams from Woodland Hills Youth Development Center when the evidence showed that there was no record of Appellant Adams having been at the facility. Again, conflicts in the testimony are to be resolved in favor of the jury verdict. Tuggle, 639 S.W.2d at 914. Additionally, the identification of a defendant as the perpetrator of an offense is a question of fact for the jury. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The testimony of a victim identifying the perpetrator is, alone, sufficient to support a conviction. Id. at 87-88.

We must now determine whether the evidence was sufficient with respect to each of the appellants' convictions.

Appellant Williams

Appellant Williams was convicted of three counts of especially aggravated kidnapping. Especially aggravated kidnapping is defined as false imprisonment:

> (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon;
> (2) Where the victim was under the age of thirteen (13) at the time of the removal or confinement;
> (3) Committed to hold the victim for ransom or reward, or as a shield or hostage; or
> (4) Where the victim suffers serious bodily injury.

Tenn. Code Ann. § 39-13-305(a) (1997). False imprisonment is committed when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (1997).

As to victims Robertson and Harbin, Appellant Williams was convicted of especially aggravated kidnapping by use of a deadly weapon. See Tenn. Code Ann. § 39-13-305(a)(1). With regard to the child, Appellant Williams was convicted of especially aggravated kidnapping committed to hold the victim for ransom or reward. See Tenn. Code Ann. § 39-13-305(a)(3).

Viewed in the light most favorable to the State, the evidence at trial established that on the night of May 29, 2001, the appellants met Robertson and Harbin under the pretense of viewing a recording studio. Once inside the studio, Appellant Williams pointed a pistol at Robertson and demanded money. Appellants Williams and Adams then hogtied and blindfolded Robertson. Appellant Williams also assisted in dragging Harbin into an adjoining room where he was bound, gagged, and beaten by Appellant Wiltz.

Thereafter, Appellant Williams forced Robertson into the backseat of his vehicle and drove to University Court where Robertson was to get money from his cousin. Appellant Wiltz followed in Robertson's vehicle with the child asleep in the backseat. However, when they arrived at University Court, Appellant Wiltz abandoned Robertson's vehicle and son in an alley and ran away. Appellant Williams then put the child into the backseat of his vehicle and Robertson into the driver's seat of Robertson's vehicle. Appellant Williams told Robertson that he had thirty minutes to get $50,000 or he would shoot his son. After Appellant Williams drove away, Robertson freed himself from his restraints and flagged down a patrol car.

While police were investigating the kidnapping and looking for Appellant Williams' vehicle, Appellant Williams communicated with Robertson by cellular telephone, demanding money. Eventually, Appellant Williams agreed to meet Robertson in north Nashville. However, police were dispatched to the area, and Appellants Williams and Adams were apprehended after wrecking into a brick wall. We conclude that the evidence was sufficient to support Appellant Williams' convictions of the especially aggravated kidnapping. This issue is without merit.

Appellant Adams

Appellant Adams was convicted of three counts of facilitation of especially aggravated kidnapping. "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under [Tennessee Code Annotated section] 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (1997). As to victims Robertson and Harbin, Appellant Adams was convicted of facilitation of especially aggravated kidnapping accomplished with a deadly weapon. See Tenn. Code Ann. §§ 39-11-403(a), 39-13-305(a)(1). With regard to the child, Appellant Adams was convicted of facilitation of especially aggravated kidnapping where the victim was under the age of thirteen at the time of the kidnapping. See Tenn. Code Ann. §§ 39-11-403(a), 39-13-305(a)(2).

Viewed in the light most favorable to the State, the evidence adduced at trial established that Appellant Adams accompanied Appellants Williams and Wiltz to Robertson's studio where he assisted in restraining Robertson and Harbin. According to Robertson and Harbin, Appellant Adams was armed with a pistol. When Robertson informed Appellant Williams that his cousin would give him money, Appellant Adams helped Appellant Williams drag Robertson to the car. He subsequently accompanied Appellant Williams as he drove around with the child, waiting for Robertson to obtain $50,000. Upon being arrested, Appellant Adams stated, "[M]an, I know I'm in

-11-

some shit, but I was just caught in the crossfire. I knew about the kidnapping, but I didn't do it." Both Robertson and Harbin identified Appellant Adams as one of the kidnappers. We conclude that the evidence demonstrates Appellant Adams' substantial assistance in the commission of the kidnappings. Accordingly, we conclude that the evidence was sufficient to support Appellant Adams' convictions of facilitation of especially aggravated kidnapping.

### Appellant Wiltz

Appellant Wiltz was convicted of facilitation of the especially aggravated kidnappings of Robertson and Harbin accomplished with a deadly weapon. Tenn. Code Ann. §§ 39-11-403(a), 39-13-305(a)(1). Viewed in the light most favorable to the State, the evidence at trial established that Appellant Wiltz accompanied Appellants Williams and Adams to the recording studio. As Appellant Williams pointed a gun at Robertson and demanded money, Appellant Wiltz struck Harbin in the head with a pistol and knocked him to the ground. After dragging Harbin into the adjoining room, Appellant Wiltz bound Harbin, tied a rope around his neck, and struck his head and legs with an axe handle. Appellant Wiltz also attempted to smother Harbin and used a handsaw to "slash" Harbin's and Robertson's throats. Appellant Wiltz then drove Robertson's vehicle, with the child in the backseat, to University Court, where he abandoned the vehicle and fled on foot. After Appellant Wiltz was apprehended, Robertson and Harbin viewed a photographic lineup, identifying Appellant Wiltz as one of the kidnappers. We conclude that the foregoing evidence was sufficient to sustain Appellant Wiltz's convictions of facilitation of especially aggravated kidnapping.

### C. Sentences

Next, the appellants challenge the sentences imposed by the trial court. Specifically, the appellants challenge the trial court's application of certain enhancement factors, the trial court's failure to apply certain mitigating factors, and the imposition of consecutive sentencing. The State argues that the appellants have waived consideration of these issues for failure to cite to the record in support of their arguments. The State further maintains that, notwithstanding waiver, the trial court properly sentenced the appellants. Generally, issues which are not supported by the appropriate references to the record will be treated as waived. Tenn. Ct. Crim. App. R. 10(b). However, because the necessary information can be gleaned from the transcript of the sentencing hearing, we will address these issues on the merits.

When an appellant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). However, this presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If the record demonstrates that the trial court failed to consider the sentencing principles and the relevant facts and circumstances, review of the sentence will be purely de novo. Id.

-12-

In conducting our review, this court must consider (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to the sentencing alternatives; (4) the nature and characteristics of the offenses; (5) any mitigating or enhancement factors; (6) any statements made by the appellant on his own behalf; and (7) the appellant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, and -103 (1997), -210 (Supp. 2002); see also Ashby, 823 S.W.2d at 168. The burden is on the appellant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

The presumptive sentence for Class A felonies is the midpoint within the applicable range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). The presumptive sentence for Class B felonies is the minimum within the range if there are no enhancement or mitigating factors. Id. If the trial court finds that such factors do exist, the court must start at the presumptive sentence, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e). There is no mathematical formula for valuating factors to calculate the appropriate sentence. State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the trial court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." Id. at 475-76.

At the sentencing hearing, the State relied on the evidence presented at trial and the presentence reports, with various corrections to the appellants' criminal histories.[2] Appellant Williams' sister, Celeste Williams, testified that she and Appellant Williams were raised by their grandmother and suffered from the lack of attention of their parents. She further related that although Appellant Williams had made some mistakes, he was a good person and would never hurt a child.

Appellant Williams relied on his trial testimony and provided the following statement to the trial court:

> I was hoping some of the family of the victim was here. I didn't get up here to discuss my innocence or guilt, I just wanted to . . . ask for forgiveness and apologize for the life I've lived and everything and just to say that I regret that a child was caught in a situation of lifestyles of me and others. That's really all I want to say, and I hope I can be forgiven for the life I've lived.

---

[2] At the sentencing hearing, the parties advised the trial court that appellants' presentence reports were inaccurate with regard to prior convictions. Accordingly, the trial court relied upon the evidence of prior convictions presented at the hearing.

Appellant Adams testified at sentencing that he was not violent and would never harm a child. On cross-examination, Appellant Adams denied any contact with Robertson or Harbin. He conceded that he had a juvenile adjudication of possession of a controlled substance with intent to sell. He further conceded that he had previously violated the conditions of probation.

Finally, Appellant Wiltz testified at sentencing that he was "an innocent person." He further denied having committed offenses as a juvenile.

### Appellant Williams

The trial court sentenced Appellant Williams as a Range I standard offender for which the applicable range for Class A felonies is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1) (1997). In sentencing Appellant Williams for the especially aggravated kidnapping of Robertson accomplished with a deadly weapon, the trial court applied the following enhancement factors:

> (2) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
> (3) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors; and
> (21) The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult.

Tenn. Code Ann. § 40-35-114 (Supp. 2002). The trial court considered as mitigating that Robertson was voluntarily released, but afforded the factor no weight, finding, "[T]he purpose for which [Mr. Robertson] was voluntarily released was to get money so they wouldn't kill his son . . . and to pay off a drug deal. That is not really what voluntary release means, but I'll give it no weight." See Tenn. Code Ann. § 39-13-305(2) ("If the offender voluntarily releases the victim alive or voluntarily provides information leading to the victim's safe release, such actions shall be considered by the court as a mitigating factor at the time of sentencing").

In sentencing Appellant Williams for the especially aggravated kidnapping of Harbin by use of a deadly weapon, the trial court found no applicable mitigating factors and again applied enhancement factors (2), (3), and (21). Tenn. Code Ann. § 40-35-114. The trial court also applied enhancement factor (6), the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense. Tenn. Code Ann. § 40-35-114(6). Finally, in sentencing Appellant Williams for the especially aggravated kidnapping of the child committed to hold the victim for ransom or reward, the trial court found no applicable mitigating factors and again applied enhancement factors (2), (3), and (21). Tenn. Code Ann. § 40-35-114. The trial court also applied the additional enhancement factors:

> (5) A victim of the offense was particularly vulnerable because of age
> . . . ;
> (10) The defendant possessed or employed a firearm, explosive
> device or other deadly weapon during the commission of the offense;
> and
> (17) The crime was committed under circumstances under which the
> potential for bodily injury to a victim was great.

Id. Based upon these findings, the trial court sentenced Appellant Williams on each count to twenty-five years, to be served consecutively, for a total effective sentence of seventy-five years incarceration at one hundred percent.

## Appellant Adams

The trial court sentenced Appellant Adams as a Range I standard offender for which the applicable range for Class B felonies is eight to twelve years. Tenn. Code Ann. § 40-35-112(a)(2). In sentencing Appellant Adams for facilitation of especially aggravated kidnapping of Robertson accomplished with a deadly weapon, the trial court applied enhancement factor (2) and also applied enhancement factor (9), the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community. Tenn. Code Ann. § 40-35-114. The trial court considered as mitigating that Robertson was voluntarily released, but afforded the factor no weight. See Tenn. Code Ann. § 39-13-305(2).

In sentencing Appellant Adams for facilitation of especially aggravated kidnapping of Harbin accomplished with a deadly weapon, the trial court found no applicable mitigating factors and applied enhancement factors (2), (6), (9), and (21). Id. The trial court afforded enhancement factor (2) great weight. Finally, in sentencing Appellant Adams for the conviction of facilitation of especially aggravated kidnapping of the child who was under the age of thirteen at the time of the kidnapping, the trial court found no applicable mitigating factors and applied enhancement factors (2), (9), (10), (17), and (21). Id. Based upon these findings, the trial court sentenced Appellant Adams on each count to twelve years, to be served consecutively, for a total effective sentence of thirty-six years incarceration.

## Appellant Wiltz

The trial court sentenced Appellant Wiltz as a Range II multiple offender for which the applicable range for Class B felonies is twelve to twenty years. Tenn. Code Ann. § 40-35-112(b)(2). In sentencing Appellant Wiltz for facilitation of especially aggravated kidnapping of Robertson accomplished with a deadly weapon, the trial court applied enhancement factor (2). Tenn. Code Ann. § 40-35-114. The trial court considered as mitigating that Robertson was voluntarily released, but afforded the factor no weight. See Tenn. Code Ann. § 39-13-305(2). In sentencing Appellant Wiltz for facilitation of especially aggravated kidnapping of Harbin, the trial court found no applicable mitigating factors and applied enhancement factors (2) and (6). Tenn. Code Ann. § 40-

35-114.  Based upon these findings, the trial court sentenced Appellant Wiltz on each count to twenty years, to be served consecutively, for a total effective sentence of forty years incarceration.

Length of Sentences

On appeal, the appellants challenge the application of enhancement factors (6), the trial court's refusal to apply mitigating factor (6), and the trial court's failure to properly mitigate their sentences based upon the fact that the victims were voluntarily released.  See Tenn. Code Ann. §§ 39-13-305(2), 40-35-113(6), 40-35-114(6).  Appellants Williams and Adams also argue that the record does not support the trial court's application of enhancement factor (21), and Appellant Adams and Wiltz challenge the trial court's failure to apply mitigating factor (4).  See Tenn. Code Ann. §§ 40-35-113(4), -114(21).

Appellants Adams and Wiltz argue that the trial court should have applied mitigating factor (4), the defendants played a minor role in the commission of the offenses.  Tenn. Code Ann. § 40-35-113(4).  In refusing to apply this factor, the trial court found with regard to Appellant Adams, "I might not be able to use that he was a leader in the offense, but I don't think by any stretch of the imagination you could say he played a minor role."  The trial court did not consider the factor in sentencing Appellant Wiltz.  We conclude that the evidence did not support the application of this factor.

With regard to mitigating factor (6), we conclude that the appellants failed to demonstrate that because of their age they lacked substantial judgment or were unable to appreciate the nature of their criminal behavior.  Tenn. Code Ann. § 40-35-113(6).  The appellants were in their twenties at the time of the offenses.  Moreover, each of the appellants had a prior criminal history, demonstrating that they were familiar with the criminal justice system.  This issue is without merit.

The appellants also challenge the trial court's failure to properly mitigate their sentences based upon the fact that the victims were voluntarily released.  See Tenn. Code Ann. § 39-13-305(2).  We note that the trial court refused to apply this factor in sentencing the appellants for the offenses involving Harbin or the child, finding that neither of these victims were voluntarily released.  The trial court did consider the factor in sentencing the appellants for their convictions involving Robertson; however, the trial court afforded the factor no weight, finding, "[T]he purpose for which [Mr. Robertson] was voluntarily released was to get money so they wouldn't kill his son . . .and to pay off a drug deal.  That is not really what voluntary release means."  As noted, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the sentencing principles and its findings are supported by the record.  Boggs, 932 S.W.2d at 475-76.  We find no error in the trial court's application of this factor.

With regard to the enhancement factors applied by the trial court, we are compelled to note that the United States Supreme Court released its decision in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), after the trial in the instant case.  This court has recognized that Blakely "calls into question the continuing validity of our current sentencing scheme."  State v. Julius E.

-16-

Smith, No. E2003-01059-CCA-R3-CD, 2004 WL 1606998, at *4 (Tenn. Crim. App. at Knoxville, July 19, 2004); State v. Michael Wayne Poe, No. E2003-00417-CCA-R3-CD, 2004 WL 1607002, at **9-10 (Tenn. Crim. App. at Knoxville, July 19, 2004), perm. to appeal denied (Tenn. 2004). In Blakely, 542 U.S. at __, 124 S. Ct. at 2537 (citations omitted), the Supreme Court held that

> the "statutory maximum" for Apprendi [v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000)] purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

Clearly, the application of enhancement factor (2), when based upon a defendant's prior convictions, does not violate the dictates of Blakely. Moreover, Blakely indicates approval of the use of enhancement factors supported by facts reflected in the jury verdict or "admitted by the defendant." Blakely, 542 U.S. at __, 124 S. Ct. at 2537; see also Apprendi, 530 U.S. at 490, 120 S. Ct. at 2362-63. Prior to Blakely, the application of the enhancement factors would have been appropriate in the instant case. However, because the facts underlying the application of enhancement factors (3), (5), (6), and (17) were not reflected in the jury verdict or admitted by the appellants, Blakely precludes their application. See State v. Ambreco Shaw, No. W2003-02822-CCA-R3-CD, 2004 WL 2191044, at *9 (Tenn. Crim. App. at Jackson, Sept. 28, 2004), application for perm. to appeal filed, (Nov. 22, 2004).

Nevertheless, we conclude that the application of enhancement factors (2), (9), (10), and (21) did not violate Blakely. Enhancement factor (2), which was based upon prior convictions, was properly applied to enhance the sentences of Appellants Williams and Adams. Moreover, because Appellant Wiltz admitted at trial that he used illegal drugs and, in fact, was a drug addict, there was no error in the application of enhancement factor (2) to enhance his sentences based upon his history of criminal behavior. At sentencing, Appellant Adams conceded that he had violated prior probationary sentences; thus, the application of enhancement factor (9) to enhance his sentences did not violate Blakely. Furthermore, Appellants Williams and Adams admitted at sentencing that they had juvenile adjudications that would have constituted felonies if committed by an adult, thereby providing the factual basis for the application of enhancement factor (21). We further note that enhancement factor (10), which was applied to enhance Appellants Williams' and Adams' sentences for the offenses involving the child, was reflected in the jury verdicts convicting the appellants of the kidnappings accomplished with a deadly weapon. We conclude that these factors were sufficient to support the sentences imposed by the trial court.

## Consecutive Sentencing

The appellants also challenge the imposition of consecutive sentencing. Under Tennessee Code Annotated section 40-35-115 (1997), a trial court may impose consecutive sentences if the defendant is convicted of more than one offense and the trial court finds by a preponderance of the evidence that:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist . . . ;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor . . . ;
> (6) The defendant is sentenced for an offense committed while on probation; or
> (7) The defendant is sentenced for criminal contempt.

In imposing consecutive sentencing, the trial court found the appellants to be dangerous offenders who have no hesitation about committing a crime in which the risk to human life is high. However, in State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our supreme court held that satisfying Tennessee Code Annotated section 40-35-115(b)(4), by itself, was not sufficient to sustain consecutive sentences. If the defendant is found to be a dangerous offender under the statute, the trial court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant, the "Wilkerson factors." Id. Moreover, trial courts must make specific findings regarding these factors before imposing consecutive sentences. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

In the instant case, the trial court determined that consecutive sentencing was reasonably related to the severity of the offenses. Specifically, the trial court found that the facts and circumstances surrounding the offenses, including leaving a victim tied up after being beaten, threatening a child's life, and causing a police chase, were "incredibly dangerous." The trial court further found that consecutive sentencing was necessary to protect the public from further criminal activity by the appellants, noting that the appellants have previously been involved with the criminal justice system and their behavior has not been deterred.

We conclude, as did the trial court, that the appellants qualified as dangerous offenders. Accordingly, we affirm the imposition of consecutive sentencing.

-18-

### III. Conclusion

Finding no reversible error, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE